William S. and Mary P. Serri v. Commissioner.
Serri v. Commissioner
Docket No. 91969
United States Tax Court
T.C. Memo 1964-219; 1964 Tax Ct. Memo LEXIS 120; 23 T.C.M. (CCH) 1319; T.C.M. (RIA) 64219; August 18, 1964
*120 1. Held, respondent failed to carry his burden of proof as to fraud for the years 1942 through 1946 because no returns for those years were introduced in evidence and there was no other proof offered as to what petitioners' returns for those years had contained. Assessment of deficiencies for those years is barred by the statute of limitations. 2. Held, petitioners fraudulently omitted substantial amounts of income from their income tax returns for each of the years 1947 through 1956 with intent to evade tax. Therefore, assessment for those years may be made at any time and the 50 percent penalty for fraud is also applicable. 3. Held, the penalty for substantial understimation of estimated tax is also applicable to each of the years 1947 through 1954. David Berger and Frank S. Deming, for the petitioners. Edward L. Newberger, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: In his notice of deficiency dated January 18, 1961, the respondent determined income tax deficiencies and additions to the tax against petitioners for the calendar years 1942 through 1956 as follows: Sec.
293(b), 1939
Code or
Sec.
Sec. 6653(b),
294(d)(2)
Year
Deficiency
1954 Code
1939 Code
1942
$ 5,444.20
$ 2,722.10
1943
16,838.59
8,419.30
1944
9,095.38
4,547.69
1945
7,432.31
3,716.46
$ 445.97
1946
3,602.63
1,801.32
233.94
1947
4,844.39
2,422.20
404.25
1948
2,056.66
1,028.33
166.97
1949
8,639.70
4,319.85
641.88
1950
8,241.48
4,120.74
514.14
1951
27,034.54
13,517.27
1,636.56
1952
15,956.76
7,978.38
1,663.90
1953
19,287.60
9,643.80
1,327.78
1954
22,097.78
11,048.89
1,381.61
1955
35,815.51
17,907.76
1956
7,296.86
3,648.43
*121 The issues for decision are: (1) Whether the petitioners filed a false or fraudulent return with the intent to evade tax for each of the years 1942 through 1956. (2) Whether the petitioners omitted from gross income an amount in excess of 25 percent of the amount of gross income stated in the return for each year. (3) Whether the respondent properly determined deficiencies for 1942 through 1956 on the basis of net worth plus expenditures less nontaxable income. (4) Whether any part of the deficiencies was due to fraud within the meaning of sections 293(b) of the 1939 Code and 6653(b) of the 1954 Code. (5) Whether the petitioners substantially underestimated their estimated tax for each of the years 1945 through 1954 within the meaning of section 294(d)(2) of the 1939 Code. Findings of Fact The stipulated facts are found accordingly. Some of them are set forth in detail herein. The petitioners, William S. Serri and Mary P. Serri, are husband and wife, and reside in Merchantville, New Jersey, with their three children. They filed joint income tax returns (income and victory tax in 1943) for the calendar years 1942 through 1951 with the collector of internal revenue at Camden, New Jersey; *122 for the calendar year 1952 with the director of internal revenue, Camden, New Jersey; and for the years 1953 through 1956 with the district director of internal revenue at Camden, New Jersey. Mary P. Serri is a petitioner herein solely by reason of the filing of joint returns, and hereinafter William S. Serri will be referred to as Serri or the petitioner. The returns for 1942 through 1946 were destroyed in accordance with sections 366 to 374, U.S.C.A., Title 44, and internal revenue policy relating to the periodic destruction of income tax returns. The petitioner paid estimated income tax, and according to his own accounts had income tax liabilities which by independent calculation would indicate net incomes as follows: Income
Net
Estimated
Tax
Income
Year
Tax Paid
Liability
Computed
1942
$1,253.76
$ 7,637.50
1943
$1,829.94
1,630.51
9,175.08
1944
1,570.52
1,503.93
7,720.45
1945
1,568.33
1,365.84
8,140.82
1946
1,400.00
1,696.30
10,418.60
Serri reported net incomes and paid estimated taxes and income tax liabilities in his returns for the calendar years 1947 through 1956 as follows: Net or
Taxable
Income Tax
Income
Estimated
Liability
Year
Reported
Tax Paid
Paid
1947
$15,399.28
$1,500
$3,393.11
1948
15,346.85
1,500
2,295.68
1949
20,695.21
1,500
3,557.76
1950
16,040.74
2,400
2,727.52
1951
14,812.70
2,500
2,741.42
1952
24,384.71
2,800
6,241.58
1953
22,889.71
2,800
5,642.10
1954
21,708.21
5,000
5,929.12
1955
25,240.75
5,000
7,333.52
1956
23,745.84
7,000
6,703.42
*123 The petitioner was born on December 26, 1911, in Pennsylvania. He received his elementary and high school education in Camden, New Jersey; he attended the University of Pennsylvania for 2 1/2 years; and is a graduate of Hahnemann Medical College of Philadelphia. He completed his education in 1936 and served an internship with the West Jersey Hospital in Camden, New Jersey. Serri began his medical practice in the community of Mullica Hills, New Jersey, in 1937. He closed this office a few years later and opened offices in Swedesboro, New Jersey, a farming community, and in Camden, New Jersey, an industrial city. In late 1941 or early 1942 he closed the Camden office due to war conditions but reopened it in 1946. He lived in the same building with his Swedesboro office until he moved to Merchantville in 1949. During the years 1942 through 1956 Serri engaged in the general practice of medicine and did some X-ray work. From 1946 to 1952 he also did X-ray work for the Veterans Administration. The Swedesboro office building was licensed as a private hospital from 1949 until April 1957. The hospital consisted of two beds used in keeping patients overnight for G.I. Series and X-ray work. *124 The petitioner had an X-ray technician in Camden who helped him two days a week. In addition, he had an assistant, Jeannette Kanady, who worked with him as long as the office was open. In fact, at least part of the time she lived with the Serris or with Serri's mother at Swedesboro upstairs over the office-hospital and was almost like one of the family. She started working for Serri in 1940, and was still his employee at time of trial. Serri had such an extensive general office practice that he installed a numbering system for his patients. He made no appointments and each patient received a number when he arrived which determined his place in line. The numbers were placed on the porch of Serri's office and this allowed patients to get a number early and then take a nap or have time to run errands or do something else before their turn to see the doctor would come up. The patients would start arriving at 5:00 or 5:30 in the morning to get their numbers. They then would either leave to return later on or some of them would stand around on the porch of the office or sleep in their cars until time for their visit with the doctor. It was not always possible to tell exactly when a number *125 could come up. There were often numbers missing due to the fact that some were never returned and others were taken by passing school children. We find on all of the evidence that Serri managed to see an average of 7 patients an hour and that the average visit per patient was less than 10 minutes. Serri dispensed most of the required pills and did not write prescriptions except for special drugs. He charged each patient the same fee unless it was an unusual situation. The stipulated average charge for a patient's visit was $3.00 in 1951 and 1952, $3.50 in 1953 and 1954, and $4.00 in 1955. These averages include free visits, home visits, X-rays, lesser charges to old-time patients and other variances. We find that Serri also averaged $3.00 per visit for the years 1942 through 1950. No accounts were run or bills sent; it was a cash system. Serri opened his office between 7:00 and 8:00 in the morning and saw patients until approximately 12:30 at night. He often - worked even later, not closing the office until 1:30 or 2:30 in the morning. He also worked up to 9 hours on Saturday and holidays found him on the job too. Other than occasional days off, he took no vacations. He did take several *126 short rest periods or naps during the day which were necessitated by the fact that he had Mediterranean Anemia. He also spent some time commuting between offices, and between his home and offices, but the distances were not great and at least part of the time he slept at his office at Swedesboro even after he had moved to his new home at Merchantville. The parties stipulated that Serri worked the equivalent of 275 full days a year during the years in question. This figure takes into consideration partial days worked since he opened his office on 301 actual days. We find that Serri averaged at least 14 hours per full working day. In his medical practice Serri maintained records under the Histacount Bookkeeping System for some of the years in question. Sample pages from these records were introduced into evidence by respondent. Although deductions or expenditures were shown in great detail on these sheets, the total receipts for the day were made in a single entry or sometimes two entries - one for the Swedesboro office and one for the Camden office. According to petitioner's explanation his total receipts figure was arrived at by deducting the daily starting cash from the cash in the *127 drawer at the end of the day. There were numerous changes in the records with respect to income; total daily receipts and even total monthly income was rewritten. No explanation for this was given at trial. The records introduced do not reflect this same rewriting with respect to the detailed expense disbursements recorded therein. Serri did not keep any other books or records to reflect his other income such as interest, rent, capital gains or dividends. Not one of the pages in evidence discloses the receipt of any income whatever save that derived from petitioner's medical practice, and his related hospital, V.A. and X-ray operations. Serri also kept a patient card record in which he entered the patient's name and address and medical history. No fees were recorded on these cards, and many of them were lost. The petitioner had no books or records for his professional income or expenses other than the Histacount and patient cards, as described above, and he did not have these for all years or all patients. The accountant or attorney who prepared his returns received only total figures. These figures were brought to him by Serri or Jeannette Kanady, and he never saw Serri's bank records *128 or his books. On April 18, 1956, an internal revenue agent was assigned to make an investigation of the petitioner's income tax liability. On that date he called on Serri to discuss the case with him generally, find out how he kept his books and records, and begin his inquiries. At that interview Serri stated that he had no record of cash on hand at any given time. He did not mention anything about his diary or a family cash hoard or inform the agent that any of his expenditures or deposits were of funds that were not his own. At no time subsequently during the entire investigation did Serri show any of the agents a diary entry relating to cash or an inventory of cash. Two days after this first interview, Serri visited his own safe-deposit box in the Camden Trust Company. In January 1957, a special agent was also assigned to the case and he was assisted at times by another special agent. On April 1, 1957, the three agents met with Serri and after placing him under oath questioned him in the presence of a reporter about his financial affairs and tax returns. At that time Serri, who was not represented by counsel, stated that he had a few thousand dollars in a safe-deposit box and a *129 couple of hundred dollars at home; that he had never received any gifts exceeding $100 from anyone nor any inheritances or money from trust funds, nor proceeds of any insurance policies; that he purchased art and antiques because he liked them and thought they were good investments; that most of his purchases of these objects were by check and that he had not purchased any since 1954; that he never bought any antiques or paintings for anyone else; that he had some other cash that he used to buy furniture in 1954; that most of the cash that he had on hand was either cash in pocket or in the bank; that he had not received any income or money from his father's estate; that the cash he had in the safe-deposit box was very old and he had had it for maybe 15, 20, or 25 years; that he did not know what the income of his mother, Maria Serri, was and that she was dependent upon him for support during 1951 to 1955. Several months later, in July 1957, Serri accompanied by his then attorney, met again with the revenue agent. At that time he refused to sign the written transcript of his answers to questions given at the April 1st meeting, on advice of counsel, and requested that some of the answers *130 be changed. The agents refused to change the answers. Serri and his lawyer offered to give a supplemental affidavit setting forth what they then contended would be correct answers to the questions asked in April. Such supplemental affidavit was not furnished and Serri never signed the transcript of the April 1st question and answer session. The agents present at that meeting and the reporter who transcribed the testimony all certified that it was a true transcript, and no witness was produced by petitioner to testify otherwise in any particular. On May 3, 1957, Serri with the agents took an inventory of the cash in the Camden Trust box; it contained $4,000, all in bills of $10 denomination similar to currency then in use and circulation; none of this currency was old, musty, smelly or otherwise distinctive in appearance or odor. On May 7, 1957, and January 8, 1963, Serri visited this safe-deposit box again. The money that was removed from this box by Serri and his accountant on this last visit, just prior to trial, was not the money inventoried by the agents on May 3, 1957. The investigation was concluded in late 1958. During their investigation the agents were given no records of *131 the medical receipts other than some of the Histacount pages. They were unable to find a correlation between total deposits and reported income even after making allowance for loans. Serri had no consistent practice for depositing receipts, but there were substantial differences in all years between the deposits and the total receipts shown on the Histacount records that were furnished. The respondent determined the petitioner's net income for the years 1942 through 1956 on the basis of the increase in net worth for the respective years plus personal living expenses less nontaxable income. With the exception of (1) the ownership of the art objects, (2) cash on hand, (3) a highboy purchased in 1955 for $13,000, and (4) $1,000 in a Penn Federal Savings and Loan Association account, all the elements of the net worth computation were stipulated. It was stipulated that the highboy in question was bought from Israel Sack in 1955 for $13,000, and that Serri turned into Sack a Chippendale armchair for which he received a credit of $900. This armchair was his, one that he had previously purchased from Sack. The highboy was insured by the Philadelphia and Marine Insurance Company under the name *132 of William Stephen Serri, and the invoice from Israel Sack, Inc., dated January 10, 1956, covering the purchase of the highboy showed that it was sold to Serri. Serri did not pay the balance due to Sack at the time of the purchase but instead paid for it in several installments over a period of months. Jeannette had worked for Serri for approximately 15 years and during this time it is stipulated that she never worked for anyone else and was paid only $1,040 per year. We find that the highboy was purchased by Serri, not by him for Jeannette's account, and that all of the $13,000 purchase price of the highboy was paid by Serri by the trading in of his Chippendale chair for a $900 credit and from his own funds. We find that the $1,000 in the Penn Federal Savings and Loan Association account in the name of Mary Serri, in trust for William S. Serri, Jr., resulted from funds which Mary inherited and not from funds of the petitioner. Mary had inherited $5,000 from her mother in 1950. In 1949 Serri met Leroy Ireland, an art expert, and sought his assistance in investing in paintings. Ireland and his wife were friends and patients of Serri's through all the years until time of trial and did *133 not pay him for medical services rendered on frequent occasions. He was paid by Serri for purchases in cash or by check and cash was paid in about 6 or 7 transactions. Ireland's wife saw cash transactions between Serri and her husband. Serri informed Ireland in 1949 that he had $125,000 to invest in art and that he had family funds to invest. Neither of the Irelands knew anything about it other than what Serri had told them. Both described the money they had seen and handled as old, crumbly, and musty, and they said they had seen among the bills a few old large-size ones no longer in circulation. In 1950 Serri met John Walton, an antique dealer, and asked his aid in investing in antiques. He told Walton that he could invest between $100,000 and $125,000 in antiques, and that he was using funds which had been accumulated over several years. He frequently paid Walton with old bills which Walton described as worn, musty, and mildewed. Serri also paid Walton for some of his purchases by check. He told Walton in answer to an inquiry as to why he paid cash, that it was some money his father had left him. On all of the testimony, we find that he never told either the Irelands or Walton that *134 all the funds he had to invest were family funds or that he was investing them for his family. The implication he created was that he had inherited money. It was stipulated that Serri purchased antiques and art objects from the following sources in the following amounts, but it was not agreed that he paid for these items with his funds or that the objects purchased became his assets: Antiques, Art Objects, Jewelry, Etc.
12/31/49
12/31/50
12/31/51
12/31/52
Parke Bernet
$ 1,734.00
$10,332.85
$21,260.81
Samuel T. Freeman & Co.
$25,276.50
37,045.25
53,287.95
59,386.95
Israel Sack, Inc.
John S. Walton
11,500.00
41,263.00
O. Rundle Gilbert
12,346.00
12,346.00
Blum's Antique Shop
William D. Morley, Inc.
Antiques, Art Objects, Jewelry, Etc.
12/31/53
12/31/54
12/31/55
12/31/56
Parke Bernet
$30,275.37
$33,399.06
$36,865.00
$36,865.00
Samuel T. Freeman & Co.
63,702.95
85,673.95
86,273.95
86,666.45
Israel Sack, Inc.
[1] *135 1,000.00 [1] 1,000.00 John S. Walton
53,290.13
87,140.13
95,690.13
95,690.13
O. Rundle Gilbert
12,346.00
12,346.00
12,346.00
12,346.00
Blum's Antique Shop
1,750.00
1,750.00
1,750.00
William D. Morley, Inc.
1,925.00
1,925.00
The amounts set forth in the abovestipulated table of purchases are cumulative and only the excess over the prior years' purchases represents the amount of purchases made in each year. It was also stipulated that Serri's assets and liabilities, except for cash on hand and the ownership of the art objects, were as reflected in the following table. Also included in this table are the stipulated living expenses, itemized page 2 deductions, and the nontaxable portion of capital gains for each of the years indicated. ASSETS
1/5/42
12/31/42
12/31/43
12/31/44
Cash in Banks
$ 742.53
$ 496.28
$ 251.34
$ 56.87
United States Government
11,306.25
19,406.25
35,906.25
37,106.25
Bonds
Depreciable Assets
11,788.00
20,525.00
20,525.00
20,525.00
Antiques, Art Objects,
Jewelry, Etc.
Investments (Stocks and
10,255.97
9,654.58
10,122.10
7,901.25
Certificates)
Real Estate (Personal)
14,500.00
14,500.00
14,500.00
20,250.00
Personal Automobiles
Total Assets except cash on
$ 48,592.75
$ 64,582.11
$ 81,304.69
$ 85,839.37
hand
LIABILITIES
$ 8,948.34
$ 14,754.23
$ 10,625.00
$ 5,125.00
Mortgages Payable
Loans Payable
Accounts Payable
610.00
1,485.00
2,360.00
3,235.00
Reserve for Depreciation
Total Liabilities
$ 9,558.34
$ 16,239.23
$ 12,985.00
$ 8,360.00
Living Expenses
7,442.65
10,335.30
9,825.70
Itemized P. 2 Deductions
1,000.00
1,000.00
1,000.00
Non-Taxable Portion of
302.23
126.18
Capital Gains
*136 ASSETS
12/31/45
12/31//46
12/31/47
12/31/48
Cash in Banks
$ 1,908.04
$ 723.05
$ 3,656.56
$ 2,051.56
United States Government
33,356.25
26,906.25
27,618.75
26,418.75
Bonds
Depreciable Assets
30,435.47
31,031.37
35,059.02
40,571.02
Antiques, Art Objects,
Jewelry, Etc.
Investments (Stocks and
9,301.25
10,521.25
11,741.25
12,717.25
Certificates)
Real Estate (Personal)
20,250.00
45,250.00
45,250.00
26,187.50
Personal Automobiles
Total Assets except cash on
$ 95,251.01
$114,431.92
$123,325.58
$107,946.08
hand
LIABILITIES
$ 4,625.00
$ 19,125.00
$ 17,225.00
$ 3,125.00
Mortgages Payable
Loans Payable
Accounts Payable
5,562.37
8,008.92
11,261.00
15,447.87
Reserve for Depreciation
Total Liabilities
$ 10,187.37
$ 27,133.92
$ 28,486.00
$ 18,572.87
Living Expenses
10,066.38
11,478.03
12,678.49
15,108.73
Itemized P. 2 Deductions
1,000.00
1,000.00
1,000.00
2,300.00
Non-Taxable Portion of
Capital Gains
ASSETS
12/31/49
12/31/50
12/31/51
12/31/52
Cash in Banks
$ 1,906.38
$ 3,290.16
$ 1,064.67
$ 719.08
United States Government
17,850.00
14,850.00
14,925.00
14,925.00
Bonds
Depreciable Assets
43,119.27
46,389.37
45,996.37
45,996.37
Antiques, Art Objects,
25,276.50
38,779.25
87,466.80
134,256.76
Jewelry, Etc.
Investments (Stocks and
151.25
151.25
151.25
151.25
Certificates)
Real Estate (Personal)
68,187.50
68,187.50
60,437.50
60,437.50
Personal Automobiles
2,375.68
2,375.68
2,877.21
Total Assets except cash on
$156,490.90
$174,023.21
$212,417.27
$259,363.17
hand
LIABILITIES
$ 15,625.00
$ 11,525.00
Mortgages Payable
7,000.00
7,000.00
$ 4,167.43
$ 4,167.43
Loans Payable
500.00
10,360.00
Accounts Payable
18,469.49
21,710.43
25,975.03
30,490.43
Reserve for Depreciation
Total Liabilities
$ 41,094.49
$ 40,235.43
$ 30,642.46
$ 45,017.86
Living Expenses
15,688.46
19,371.22
19,769.33
18,881.50
Itemized P. 2 Deductions
2,315.00
2,917.00
2,898.30
2,536.86
Non-Taxable Portion of
985.20
735.23
Capital Gains
*137 ASSETS
12/31/53
12/31/54
12/31/55
12/31/56
Cash in Banks
$ 4,842.07
$ 4,735.23
$ 7,819.15
$ 8,337.94
United States Government
21,300.00
21,300.00
21,300.00
21,300.00
Bonds
Depreciable Assets
47,294.37
50,979.12
51,764.12
56,214.12
Antiques, Art Objects,
159,614.45
220,309.14
245,850.08
246,242.58
Jewelry, Etc.
Investments (Stocks and
151.25
151.25
151.25
1,584.00
Certificates)
Real Estate (Personal)
60,437.50
60,437.50
60,437.50
60,437.50
Personal Automobiles
2,877.21
2,877.21
3,492.00
3,492.00
Total Assets except cash on
$296,516.85
$360,789.45
$390,814.10
$397,608.14
hand
LIABILITIES
Mortgages Payable
$ 2,167.43
$ 19,667.43
$ 19,667.43
$ 15,429.43
Loans Payable
13,288.03
21,680.03
4,409.80
2,158.73
Accounts Payable
34,343.28
34,594.16
37,141.45
39,301.25
Reserve for Depreciation
Total Liabilities
$ 49,798.74
$ 75,941.62
$ 61,218.68
$ 56,889.41
Living Expenses
24,109.85
27,821.37
27,276.06
28,020.49
Itemized P. 2 Deductions
2,813.68
2,244.54
3,336.98
3,013.88
Non-Taxable Portion of
Capital Gains
On January 5, 1942, Serri filed a financial statement of net worth with the Nutter Mortgage Service Company in Camden, New Jersey, in connection with his application for a mortgage loan to finance the purchase of an office building. In this statement Serri stated that he *138 had cash in bank and on hand in the amount of $12,000, with the notation on this line "U.S. Gov. Bonds." Serri's bank balance on that date was $742.53. The respondent also concedes that Serri had $4,000 in cash, that amount having been later inventoried in Serri's safe-deposit box at the Camden Trust Company. Thus Serri's total cash on hand as of January 5, 1942 was $15,257.47. There was no other record of cash on hand, and Serri kept no such records during the years in question. The petitioner's father, Salvatore A. Serri, worked for the Pennsylvania Railroad from October 24, 1911, until his death on August 11, 1944. He began as a shop hand at 21.8 cents an hour, and at his death he was making only 80 cents an hour. In 1918 he was given a job as a switchman which paid over 91 cents an hour, but he was removed from this position after less than five months because it was claimed that he had been responsible for three accidents. His total annual salary with the railroad appears below; however, no records were available for 1917 through 1923 as well as for January of 1914 and 1916. Also, his name did not appear on the payroll for November and December of 1930 and for January through *139 July of 1931. Year
Total Yearly Wage
10/24/1911
$ 116.85
1912
915.10
1913
910.50
1914
806.80
1915
932.20
1916
773.25
1924
1,491.94
1925
1,500.22
1926
1,487.12
1927
1,462.48
1928
1,590.93
1929
1,497.58
1930 (Jan. through Oct.)
1,129.85
1931 (Aug. through Dec.)
623.56
1932
1,199.54
1933
933.96
1934
1,055.04
1935
1,158.45
1936
1,192.49
1937
1,130.46
1938
1,425.92
1939
1,525.01
1940
1,410.32
1941
1,562.14
1942
1,765.00
1943
1,783.17
8/11/1944
1,247.77
Salvatore emigrated to the United States with his wife, Maria, from Catania, Sicily, in 1909. When he first arrived in this country he got a job as a shoe repairer, and later he played the French horn with several bands in New York. When he went with the Pennsylvania Railroad in 1911 he became a member of the Tyrone Division Band and later of the Camden Division Band. He also played with several orchestras in Philadelphia, gave music lessons, and repaired music intruments. He earned some income through the production of local plays; a hair tonic and application which he patented; acting as a court interpreter; by renting his home as a polling place; and by selling life insurance. However, apparently none of these activities were very lucrative, and there is no evidence of his earnings from any *140 of them. Consequently, his job with the Pennsylvania Railroad provided his major source of income. Maria Serri added a little to the family income as a seamstress by doing piecework in various places in Philadelphia as well as taking in private sewing. The petitioner's brother, Humbert Serri, was a pianist and he added to the family income by playing in night clubs or with orchestras. He worked for Serri for a number of years at $30 or $40 a week when Serri first started his practice and sometime later became a pharmacist. The petitioner started to work at an early age selling newspapers. Later he formed his own orchestra - Serri Pennsylvanians - and played at Pine Point Park, Seaside Park, and several night clubs. He also was employed at various times by the Pennsylvania Railroad, the Radio Corporation of America, and Hollingshead Mills. We find, however, that the total family income for the years when Serri was going to school never exceeded $5,000 to $6,000 per year. This income supported Salvatore, his wife, his two sons, and his mother, who died in 1949. The Serri parents paid for the college and medical school education of petitioner and before his death in 1944, father Serri *141 allegedly purchased a house in Camden for petitioner for which he paid $11,000. Serri worked while going to college but his estimates of his earnings and the earnings of other family members during this period were vague and unsubstantiated. He testified that his parents paid for his education. The family had a steel box in which they kept their earnings and this was replaced in 1926 by a safe 33 1/2 inches high, 21 1/2 inches wide, 23 inches deep and with an interior 21 1/2 inches high, 16 inches wide, and 18 inches deep. There is no record of any income tax being paid by Salvatore A. Serri or his wife, Maria, during the years 1913 through 1939, and 1944 through 1956. They paid taxes in 1940 of $12.42 and in 1941 of $107.98. Salvatore paid income taxes in 1942 and 1943 of $191 and $44.83, respectively, while Maria paid $126 for 1942 and $65.50 for 1943. Salvatore A. Serri died in 1944, but there is no record of a Federal estate tax return filed for his estate. However, a transfer inheritance tax report was filed with the State of New Jersey, State Tax Department, Transfer Inheritance Tax Bureau, Trenton, New Jersey, by his widow, Maria. It stated that at death he had cash on hand *142 of $252, furniture of $100, a musical instrument worth $50, and United States War Bonds with a value of $4,568.96. It also stated that he owned no real property. Salvatore and Maria owned their residence as tenants by the entirety and, therefore, it was not included in his estate. The Department of Health, Education, and Welfare, Social Security Administration records show that during the 8-year period from January 1, 1937 through December 31, 1944, Maria was credited with earnings of $9,406.79, an average of $1,175 per year, while Salvatore was not credited with any earnings. Petitioner claimed Maria as a dependent mother in his 1949 Federal income tax return and in his returns for 1952, 1953, and 1954 he also claimed her as a dependent stating that she lived in his home and he contributed her entire support. Serri originally told the agents that he never received any gifts in excess of $100 nor did he ever receive any inheritance or trust monies. He testified at trial, however, that his grandmother, Carmela Serri, gave him $4,000 in cash prior to her death in 1949. He claimed her as a dependent relative on his Federal income tax return for that year showing thereon that she lived *143 is Camden with his mother, Maria Serri, who was also claimed that year by Serri as a dependent. [1] We hold that receipt of this alleged gift of $4,000 in 1949 has not been proved. In 1946 Serri had purchased certain property in Moorestown for $25,000 and at or about this time he took out a mortgage for $15,000 with the Camden Trust Company. In 1949 Serri purchased certain property in Merchantville for $42,000, and at or about this time he took out a mortgage for $20,000, cashed in approximately $10,307 in Government bonds and sold his Investors Syndicate certificates for $14,536.40. He realized gains on both the bonds and the certificates, but these gains were not reported in Serri's 1949 tax returns. In 1954 Serri had bank deposits of $80,300. This included proceeds of a loan of $17,500 which was used toward the purchase of the *144 Wilstach art collection. That year he reported total receipts from his medical practice of $49,801 and this total allegedly also included all income from other sources as well. During the period in question, Serri used three safe-deposit boxes. From April 18, 1946, to June 8, 1956, he and his wife jointly leased a safe-deposit box from the Camden Trust Company, with dimensions of 5 inches by 5 1/2 inches with a depth of 23 1/2 inches, and on December 8, 1947, Serri leased a safe-deposit box from Camden Trust with dimensions of 4 inches by 11 3/8 inches with a depth of 23 1/2 inches. From July 30, 1948, to July 1, 1955, he used a box in the Northwestern National Bank (now Broad Street Trust Company) in Philadelphia. During at least a portion of this time he had box No. 2026, a $50 box. However, he paid only $10 a year for this box. Said box had dimensions of 12 inches by 10 1/4 inches with a depth of 21 1/2 inches. Said box could hold 21,000 pieces of currency of the style of paper currency currently in use. Serri had the following increment in value of his redeemed United States Savings Bonds: Date Bonds Redeemed
Increment
1944
$ 25.00
1945
1,050.00
1946
155.00
1947
262.00
1948
525.00
1949
2,113.25
1950
680.00
1953
525.00
On *145 his income tax returns for 1944 through 1953 there was no amount specifically designated as bond interest or as gain on his Investors Syndicate certificates. The 1953 bond increment was admittedly not reported, and no convincing evidence either in the form of books, records, exhibits, or testimony was produced by petitioner to establish that the bond interest or the gain on the certificate sale was in fact reported at any time throughout the years. Serri had a diary which he produced at trial and offered into evidence with an entry dated September 23, 1950, which read as follows: 9/23/50, busy day, Mom has me thinking suppose Mr. Ireland is wrong. Will
have to do more reading and research. I can't see how Mr. Ireland can tell
the age of the painting by a single glance. Mary has been going through my
things; cleaned out all my notes in my wallet.
Northwestern Bank
5's
52,000
22,000
Red seal 1928
10,000
Green seal 28-34
14,000
Brown S. 1929
6,000
Blue S. 1934
10's
40,000
20,000
Brown S. 1929
9,000
Blue S. 33-34
11,000
Green S. 28-34
20's
13,000
9,000
Brown S. 1929
4,000
Green S. 28-34
Camden Trust 1
5's
9,000
4,000
Red seal 1928
5,000
Brown S. 1929
10's
13,000
9,000
Brown S. 1929
3,000
Blue S. 33-34
1,000
Green S. 28-34
20's
8,000
3,000
Brown S. 1929
5,000
Green S. 28-34
Camden Trust 2
5's
4,000
2,000
Red seal 1928
2,000
Brown S. 1929
10's
3,000
1,000
Brown S. 1929
2,000
Green S. 28-34
20's
3,000
3,000
Green S. 28-34
Safe
5's
3,000
3,000
Red S. 1928
10's
4,000
2,000
Brown S. 1929
2,000
Blue S. 33-34
20's
3,100
1,800
Brown S. 1929
1,300
Green S. 28-34
1's
5,700
2,000
Red S. 1928
3,700
Blue S. 28-34-35
Other money
22,900
*146 Decide to tell Mom and Al about the Northwestern box in case anything happens to me. Although I put a note in the box last month with full directions as to what to do. Perhaps I had best see either Fred or Frank as to a proper procedure. These figures were allegedly taken from notes in Serri's wallet and later jotted down in the diary on the entry date indicated therein. Serri testified that the Camden Trust information was originally recorded in 1947 and the Northwestern Bank figures were recorded a few weeks prior to September 9, 1950. Serri explained that the reference to 5's, 10's, and 20's was to $1,000 bundles of $5, $10 or $20 bills. The next figure is the total which is then broken down by the color of the seal on the bill and its date of issue. Serri testified that this division of bills by the color of their seal was an idiosyncrasy of his. The diary also contained an entry made the previous month, dated August 8, 1950, which reads in part as follows: Mom worrying about my antique or art interest. Wants me to be sure to be careful. Funny thing she never questions the amount of money in safe or in boxes. I think she doesn't want me to buy things because then Mary would be *147 part owner of anything I buy. And a later entry dated December 5, 1950, states, in part, as follows: Mom and I don't get along. She has no feeling for me. Worries about Al all time. I feel all mixed up. Sometimes feel bitter toward Al & Mother. They get all they can from me. Never give anything in return. At least they could render favors etc. They feel sorry and regret that I have not done enough for them. I feel that all energy and money spent on antiques is merely as "escape." There were also contained in the diary frequent references to Serri's purchases of art and antiques, to his extensive medical practice and extremely long hours at his two offices, to his returning to spend the night at Swedesboro after visits with his family and to his marital difficulties. There are also intermittent jottings of substantial amounts of money, most of which are in no way described or explained. On March 10, 1959, a criminal indictment was filed charging Serri with wilful attempted evasion of income tax for the years 1954 and 1955. On March 20, 1959, the petitioner pleaded not guilty to a 4-count indictment and on December 22, 1959, retracted the said plea and entered a plea of nolo contendere *148 as to count 3 of the indictment which pertained to the calendar year 1954. Judge Madden of the District Court accepted the plea. The petitioner was found guilty as to this count and on March 4, 1960, in the United States District Court for the District of New Jersey, at Camden, New Jersey, was sentenced to 2 years in prison, which sentence was suspended. He was fined $10,000 and was placed on probation for 5 years. The remaining counts were dismissed on motion of the United States District Attorney. Provisions of probation were that the fine be paid in 15 days and that Serri pay the United States Government any taxes which he owes 60 days after such taxes have been legally determined. The respondent determined Serri's income on the net worth plus nondeductible expenditures, less nontaxable receipts method, beginning with the January 5, 1942, financial statement, and the respondent's reconstruction of his income shows the following understatements of income for the years 1947 through 1956: 1/5/42
12/31/42
12/31/43
12/31/44
Assets
$ 63,850.22
$ 68,582.11
$ 85,304.69
$ 89,839.37
Liabilities
9,558.34
16,239.23
12,985.00
8,360.00
Net Worth
54,291.88
52,342.88
72,319.69
81,479.37
Increase in Net Worth
(1,949.00)
19,976.81
9,159.68
Add: Living Expenses
7,442.65
10,335.30
9,825.70
Less: Itemized p. 2
1,000.00
1,000.00
1,000.00
Deductions
Less: Non-taxable Portion of
302.23
126.18
Capital Gains
Net or Taxable Income
4,493.65
29,009.88
17,859.20
Corrected
Less: Net or Taxable Income
Reported
Less: Exemptions
Unexplained Unreported Income
*149 12/31/45
12/31/46
12/31/47
12/31/48
Assets
$ 99,251.01
$118,431.92
$127,325.58
$111,946.08
Liabilities
10,187.37
27,133.92
28,486.00
18,572.87
Net Worth
89,063.64
91,298.00
98,839.58
93,373.21
Increase in Net Worth
7,584.27
2,234.36
7,541.58
(5,466.37)
Add: Living Expenses
10,066.38
11,478.03
12,678.49
15,108.73
Less: Itemized p. 2
1,000.00
1,000.00
1,000,00
2,300.00
Deductions
Less: Non-taxable Portion of
Capital Gains
Net or Taxable Income
16,650.65
12,712.39
19,220.07
7,342.36
Corrected
Less: Net or Taxable Income
15,399.28
15,346.85
Reported
Less: Exemptions
Unexplained Unreported Income
$ 3,820.79
None
12/31/49
12/31/50
12/31/51
12/31/52
Assets
$160,490.90
$178,023.21
$216,417.27
$263,363.17
Liabilities
41,094.49
40,235.43
30,642.46
45,017.86
Net Worth
119,396.41
137,787.78
185,774.81
218,345.31
Increase in Net Worth
26,023.20
18,391.37
47,987.03
32,570.50
Add: Living Expenses
15,688.46
19,371.22
19,769.33
18,881.50
Less: Itemized p. 2
2,315.00
2,917.00
2,898.30
2,536.86
Deductions
Less: Non-taxable Portion of
985.20
735.23
Capital Gains
Net or Taxable Income
38,411.46
34,845.59
64,122.83
48,915.14
Corrected
Less: Net or Taxable Income
20,695.21
16,040.74
14,812.70
24,384.71
Reported
Less: Exemptions
Unexplained Unreported Income
$ 17,716.25
$ 18,804.85
$ 49,310.13
$ 24,530.43
12/31/53
12/31/54
12/31/55
12/31/56
Assets
$300,516.85
$364,789.45
$407,914.10
$414,708.14
Liabilities
49,798.74
75,941.62
61,218.68
56,889.41
Net Worth
250,718.11
288,847.83
346,695.42
357,818.73
Increase in Net Worth
32,372.80
38,129.72
57,847.59
11,123.31
Add: Living Expenses
24,109.85
27,821.37
27,276.06
28,020.49
Less: Itemized p. 2
2,813.68
2,244.54
3,336.98
3,013.88
Deductions
Less: Non-taxable Portion of
Capital Gains
Net or Taxable Income
53,668.97
60,106.55
78,186.67
32,529.92
Corrected
Less: Net or Taxable Income
22,889.71
21,708.21
25,240.75
23,745.84
Reported
Less: Exemptions
3,600.00
3,600.00
3,600.00
Unexplained Unreported Income
$ 30,779.26
$ 38,398.34
$ 52,945.92
$ 8,784.08
Findings *150 of Ultimate Facts The Serri family did not accumulate a large cash hoard during the life of Salvatore Serri. Petitioner's purchases of antiques and art objects during the years 1949 through 1956 were made by him with his own money. At least part of the deficiency for each of the taxable years from 1947 through 1956 was due to fraud with intent to evade tax. Petitioner's income tax returns for each of those years was false or fraudulent with intent to evade tax and assessment and collection of the deficiencies and additions to tax for each of those years are not barred by the statute of limitations. Petitioner's estimated tax paid for each of the years 1947 through 1954 was less than 80 percent of the tax due and, except for the year 1952, was less than the amount of tax paid on his return for the preceding taxable year. Opinion Since the notice of deficiency was not sent until January 18, 1961, the statute of limitations provided in section 275(a) of the 1939 Code and Section 6501(a) of the 1954 Code precludes assessment for any of the years in question, except 1956 when the statute of limitations was extended by a consent agreement, unless Serri filed false or fraudulent returns *151 with the intent to evade tax. If this has been shown by clear and convincing evidence, section 276(a) of the 1939 Code and section 6501(c)(1) of the 1954 Code provide that the tax may be assessed at any time. Also, the statute of limitations can be extended to 6 years under section 6501(e) of the 1954 Code when over 25 percent of the amount of the gross income stated in the return for a year has been omitted from reported gross income. In a fraud case the Commissioner bears the burden of proof as to the issue of fraud under sections 1112 of the 1939 Code and 7454 of the 1954 Code, and he must sustain this burden by clear and convincing evidence. (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; , affirmed sub nom., (C.A. 7, 1956). An essential element of any fraud case is the petitioner's tax returns for the years in question since it is the return that must be proved false or fraudulent in order for the statute of limitations to be tolled under section 276(a) of the 1939 Code and section 6501(c)(1) of the 1954 Code. The absence of such returns has often been *152 fatal to a finding of fraud. (C.A. 6, 1962), reversing, ; (C.A. 6, 1955), affirming in part and reversing in part a Memorandum Opinion of this Court; , affirmed . It is true that this requirement has been waived when the contents of the returns have been proved by secondary evidence such as the production of a copy of the returns, (C.A. 5, 1958), certiorari denied ; or a copy of the state income tax return, together with other testimony; (C.A. 9, 1958). Here, Serri's income tax returns for 1942 through 1946 had been previously destroyed and were not offered into evidence. There is no proof of their contents. It is true that the net worth has been almost fully stipulated and that the amount of tax actually paid has been taken from the petitioner's own records. However, the gross income reported is not shown, and the deductions claimed are unknown as well as any possible tax credit. Since adjusted gross income and consequently the *153 tax due is based upon these figures, any computation of tax due without knowledge of these facts and figures can at best be only an approximation or guess. This is not the clear and convincing evidence necessary to establish fraud. We hold that the respondent has failed to establish that the returns for 1942 through 1946 were false or fraudulent with an intent to evade tax and consequently the statute of limitations has run as to those years. Since the returns are available for the years 1947 through 1956 and were all put into evidence as exhibits, the foregoing issue is not present with respect to those years. In order to establish a finding of fraud in the present case, the respondent has compared Serri's net worth plus his gross expenditures less nontaxable income for the years in question with his income as reported during this period. The "net worth method" employed by the respondent is not itself a system of accounting, but it is merely a technique for reconstructing a taxpayer's net income without regard to his accounting method. This was noted by the Supreme Court in , rehearing denied , when it said: The net *154 worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. * * * To protect the revenue from those who do not "render true accounts", the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history. The net worth method is a method of checking the taxpayer's books and records, but its use is in no way dependent on the adequacy of those books and records. , affirmed, , certiorari denied, . By showing a substantial increase in net worth which is in excess of reported income but is not attributable to nontaxable income, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the taxpayer's books and returns. , affd., (C.A. 6, 1957); , affirmed per curiam, *155 (C.A. 3, 1956), certiorari denied, ; ; In , the Court stated that an essential element in any net worth case "is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." Here the Commissioner used a financial statement of net worth which Serri filed on January 5, 1942. We believe that this is significant evidence of his cash on hand and in the bank as well as his net worth, and the fact that it was made at a time when there was no pending tax liability further increases its significance. See (C.A. 6, 1957), certiorari denied . It is also noteworthy that at no time did Serri attack this financial statement as being inaccurate. The financial statement listed cash on hand and in the bank of $12,000. Since Serri had $742.53 in the bank this leaves $11,257.47 as cash on hand. The respondent added $4,000 to this in arriving at an opening cash on hand figure of $15,257.47 to avoid any controversy over *156 $4,000 which was found in a safe-deposit box on May 3, 1957, and which petitioner claims he had on hand for a period of from 15 to 25 years. Besides proving an opening net worth or starting point, the respondent must also show a likely source of currently taxable income. Respondent argues here that this has been shown to be the petitioner's extensive medical practice. While the testimony of a few patients indicates that Serri spent between 10 and 15 minutes with each of them, we are convinced from the whole record and have found that Serri averaged less than 10 minutes with a patient. This testimony was given years later when memory had dimmed and we are not convinced that the estimates were accurate. We are also not persuaded that petitioner's own estimates and those of his assistant are any more reliable. They both estimated that Serri saw an average of 5 patients per hour. We believe that these were underestimations. In finding that patients did not spend an average of from 10 to 15 minutes per visit with Serri, we rely upon the fact that it was necessary for Serri to have a numbering system, that the patients found it desirable to come as early *157 as 5:00 in the morning and to sleep in cars or wait until their numbers came up, that Serri's fees were small and uniform, and that he had at least one full-time and one part-time assistant. All these facts indicate a rather rapid patient turnover. We have found that the actual number of patients seen by Serri each hour was approximately 7, and this, when coupled with his long hours and the little time he spent away from his practice establishes that a very likely source of currently taxable additional income was the taxpayer's medical practice. However, we do not feel that these specific numbers or the mathematical calculations that can be made by using them in various combinations are essential to a proper determination of the issues presented here. The Supreme Court held in , that in lieu of showing a likely source of taxable income the Commissioner may negative all sources of nontaxable income. It is not incumbent upon the Commissioner to disprove all possible sources of nontaxable income - only those actually claimed by the taxpayer. (C.A. 2, 1963); (C.A. *158 4, 1961), both affirming Memorandum Opinions of this Court. The only nontaxable source contended here is an alleged large family cash hoard. Serri asserts that during his father's life, and particularly during the last 15 years, all members of the family were employed at numerous occupations, regularly made large amounts of money and pooled them all together in a family cash fund. After his father's death he claims that his mother told him in late 1944 or early 1945 that she had no interest in the money and that as custodian he could do with it as he wished. The petitioner's brother, Humbert, also reputedly had no concern for the money. Serri stated that as a result of the war there was nothing to do with the money in 1945 so he let it remain until 1949 when he began purchasing art objects. We are unable to believe Serri's claims that his family had accumulated a large hoard of money which they kept originally in a steel box but transferred to the safe in 1926, and which he later placed in safedeposit boxes of his own. It does not seem plausible that Salvatore Serri could support his mother, his wife, two sons, and himself on a total yearly family income which we have found never exceeded *159 $5,000 to $6,000, and at the same time accumulate over $250,000. The years in which Serri and his brother allegedly worked too and contributed to the fund were their school years, and years of the depression period from 1930 to 1938. Their contribution could not have swelled the fund to the size it allegedly reached by 1944. During the question and answer session with internal revenue agents on April 1, 1957, Serri never once said that the art objects or furniture that he had purchased were not his own or were bought with money that was not his. On the contrary, he stated that he liked art and antiques and decided to "put my money in that" and "Instead of stocks and bonds which fluctuated I kept the cash and didn't know what to do with it, when the time came I decided to put it in paintings and furniture rather than play around stocks and bonds, I thought I would like to live with my money." Again, Serri did not at this time, a year after his first interview, mention a family cash hoard or make any suggestion or claim that the art objects and antiques he had bought were not his own, purchased with his own funds. Petitioner's only explanation for his later change of story and conflicting *160 statements was to the effect that one of the 350 questions was ambiguous and that he was tense at the interview because the environment was hostile. Sometime after this, the evidence being vague and inexact as to when, Serri, through his then lawyer, first told the agents a story of a family accumulation of cash and then began to contend that the art objects and antiques he had purchased over the years were an investment made by him for the Serri family as custodian of this cash hoard. The September 23, 1950, entry in Serri's diary does nothing to support his claim of family funds. The reliability and trustworthiness of the diary is at best questionable since many portions of pages have been clipped out and it is illegible and undecipherable. Even if we accept this one entry and the related testimony as being accurate, which we do not, all that is shown thereby is that Serri had $40,000 in the two Camden Trust deposit boxes in 1947 and $105,000 in the Northwestern Bank box in 1950, that these bills were of series dating back to 1928, and that he had other money totalling $22,900. These boxes were in Serri's name and there was nothing to indicate that he was using them as custodian *161 or trustee for anyone else or that the cash alleged to be cached away there was not his alone. As a matter of fact, the Camden Box No. 1 was in the names of Serri and his wife. Why during a period when he admittedly had many marital difficulties would he have kept $30,000 of his mother's and brother's money, of which he was alleged custodian, in a box to which his feuding and curious wife had access? And why, too, would the diary entry of August 8th state fear that Mary, the wife, would own one half of antiques bought if they were Serri family assets and not Serri's own? The cash count entry does nothing to establish or substantiate the existence of a cash hoard that belonged to anyone other than Serri. The source of these funds is not indicated, and nothing that Serri stated in the entry would designate these funds as to source or ownership. This is particularly significant because Serri's then concern, as indicated by the diary, was that his wife had been going through his things and that something would happen to him. If ownership of the cash inventoried by the entry had been as it is now alleged, without doubt that fact would have been specified. Making the record straight to protect *162 his mother's and brother's ownership of the cash would have been of paramount importance to Serri. Not only is that entry silent about this, but no other entry in the diary nor any other documentary evidence has been offered to show ownership of the cash fund or the subsequently acquired art and antique collection in anyone other than the petitioner. Another fact which negatives the suggestion that the diary entry tends to prove the family cash hoard story is the glaring gap in figures. As of the entry date, September 29, 1950, Serri has spent only $33,131.75 of the fund for art objects and antiques. According to the entry, the total cash balance then was $183,700. This would indicate that the family cash fund never exceeded the total sum of $216,831.75. However, by the end of 1956, the last year here involved and the year in which the investigation of Serri's tax returns began, Serri had bought art objects and antiques that cost him more than $258,000, over $40,000 more than the alleged family fund ever contained if the diary entry refers to that fund. This discrepancy and variance has not been explained and tends to negative and discount the claim now made that the diary entry proves *163 the family ownership of Serri's cash hoard. Perhaps some cash was turned over to Serri by his mother after her husband's death. He was the elder son and the male head of the Serri family. We cannot speculate, however, about that. Other than the diary entry, which we reject, there is no evidence of a count or even of an estimate of the size of the fund in 1944. On the evidence before us we can only conclude that no large family cash fund existed or was used by Serri to purchase over $250,000 worth of antiques and art objects in the period from 1949 to 1956. Neither the diary entry nor all of the evidence offered persuade us that we should so conclude. We are not convinced of the credibility or trustworthiness of the diary as evidence in this case. We have commented on its contents only because it was offered by the petitioner at trial and received in evidence, over respondent's objection, subject to being stricken by the Court after briefs were in. We have not struck it from evidence and believe that parts of it are relevant and material and admissible in evidence as exceptions to the hearsay rule. In spite of their self-serving nature, they supply background information and atmosphere *164 to establish prior inconsistent statements which might affect credibility, reflect, as petitioner urges, past recollection recorded. As we have indicated, we do not believe the diary evidence urged upon us by petitioner helps his case to any great extent, but, as respondent argues, we feel that to consider only part of the diary, would be improper. For these reasons we have set forth and commented upon pertinent parts of this exhibit, both in our findings and in our opinion. We would reach the same result on the record herein even if the diary were excluded, in toto, as respondent urges it should be. The petitioner contends that an essential part of any fraud case is the running down of all relevant leads by the revenue agents. While this is very desirable, the failure to do so only affects the weight of the evidence. , stated that "It is, of course, not for us to prescribe investigative procedures, but it is within the province of the courts to pass upon the sufficiency of the evidence to convict." Here, we do not find any flagrant investigative omission but on the contrary the respondent has made a rather thorough investigation, especially when we *165 consider the fact that the job was made extremely difficult by the inadequacy of Serri's records and the vague generalities of the leads furnished. Serri testified that his father made extra sums of money by selling insurance, teaching music, reparing instruments, and from two patents. He was unable to give any estimates of the amounts thus earned and no other evidence was offered to prove these general allegations. The improbability of such claims is demonstrated by the fact that Salvatore Serri was willing to work full time for the Pennsylvania Railroad at an extremely modest salary over a period of many years until his death. Similarly, the fact that Serri's brother worked for Serri for several years at $30 or $40 a week belies the assertion that he earned up to $100 a week as a pianist during earlier years in the depression which Serri alleged in his testimony. We find the assertion that Serri's family had accumulated over one quarter of a million dollars by the 1940s is false and contrary to all of the credible evidence before us. Consequently, we conclude that Serri never became the custodian of any substantial amount of family funds, and the money he spent through the years *166 for art objects and antiques was his own. This finding is buttressed by the fact that although Serri claimed to have an extensive cash supply, he found it necessary to take out a $15,000 mortgage in 1946 and in 1949 to take out a loan for $20,000 as well as cash in Government bonds and his Investors Syndicate certificates for around $24,843.40. He also took out a $17,500 loan to help purchase the Wilstach collection in 1954. Up to December 31, 1953, he had purchased only $159,500 worth of antiques, art objects, etc., according to the stipulated facts, and as of December 31, 1954, the total of such purchases, including the Wilstach painting collection, was only $220,000. Even assuming that these objects were purchased with family funds, and that the collection was the last purchase in the year 1954 (which is not shown by the record), there would then have been more than $17,500 left in the family hoard, spent later on subsequent purchases. Serri offered no convincing or satisfactory explanation of the reasons for borrowing this sum in 1954. This apparent need to borrow money is inconsistent with the claim of a pre-existing secret cash hoard. ; *167 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court. Serri's claim that he could not use family funds for his personal are is clearly refuted by his free use of the funds to buy antiques and art objects that pleased and suited his own taste for his own personal use. He dealt with them freely as his own and used them in his own homes. He wanted to be surrounded by them and if he did not like them after living with them for awhile, he returned them and selected others. He did not merely store them away to await appreciation in value. If Serri had been only the family custodian, as claimed, he certainly would not have been allowed to spend all the money for antiques and are objects for his personal use and enjoyment and leave his brother, Humbert, without any benefit of the wealth. Petitioner testified that he bought the highboy from Sack for his office assistant, Jeannette Kanady, in 1955, and that the $12,000 balance he paid was cash given to him by her from her savings. Jeannette testified to the same effect - that it had been bought for her; that she had given Serri $12,000 in cash to pay for it; and that she had it in Serri's house in Swedesboro where she lived. It was allegedly *168 from her earnings of $1,040 per year from 1940 to 1955 that she had accumulated the $12,000 in cash to purchase this rare and expensive highboy. We have also rejected this story as fabricating and have found that Serri purchased this valuable antique for himself and with his own funds. Statements by Ireland, Walton, and Kanady that they saw or received old money of small denominations from Serri, do not prove the existence of a family cash hoard. As a doctor who charges a small set fee it would not be unusual for Serri to receive old looking bills of small denominations in payment. Also, the only knowledge they had as to the source or ownership of the cash was what they had been told by Serri, and even that was inconsistent and conflicting. We realize that it may have been difficult for Serri to substantiate the acquisition prior to 1942 of a family cache of the size alleged, but the particular facts of this case make such a story extremely suspect. The major support for Serri's claim of a family cash hoard lies in his own selfserving statements, and we are strongly influenced in this opinion by the fact that this testimony very definitely lacked a trustworthy ring. Having observed *169 his demeanor upon the witness stand and throughout the trial we found him evasive and lacking in candor. Similarly, Jeannette Kanady did not appear to be completely candid in her testimony. Her bias and interest were apparent. Also the story was not substantiated by other persuasive evidence, or even by the testimony of family members who allegedly contributed to the fund. Maria Serri, petitioner's mother, was called by respondent and said that she did not count the cash her husband left and did not know how much it was because it was all together, "all the family's is there." As indicated in our findings, however, she filed a New Jersey inheritance tax return following her husband's death showing that his total estate was less than $5,000 and that he had cash at death of $252. We have considered this report only as evidence bearing on Maria's credibility and not to establish the facts therein contained, or the amount of cash Salvatore Serri may have had at time of death. Maria did not give any believable testimony that would substantiate Serri's story of a family cash hoard. She was not called as a witness by petitioner and gave no testimony as to her earnings, her contribution to *170 the hoard, its size, her knowledge of its existence or to verify that she turned it over to Serri after her husband's death as petitioner alleges. Neither did Humbert Serri testify although petitioner repeatedly involved him in the cash hoard story. We can only conclude that their testimony would not have bolstered petitioner's case, and might even have been unfavorable if produced. Cf. , affd. (C.A. 10, 1949); , affd. (C.A. 10, 1947). The other meager evidence offered by petitioner is not sufficiently strong to bolster the cash hoard story. The tangled web of the petitioner's fabrication to establish the existence of a huge family cash hoard does not stand up under scrutiny. We are unconvinced by the labyrinth of slender threads which were woven into a story for the revenue agents only after their investigation had been going on for over a year and they had pinned the doctor down in their question and answer session of April 1, 1957. He attempted to mislead the agents; he was evasive and contradictory and at that time he told a very different story from his later version *171 of the family cash hoard and his investment of it in art objects and antiques. As we pointed out above, we were not impressed with the cerdibility of petitioner's oral testimony nor with the supporting testimony offered to substantiate his story. We have considered Serri's conviction for income tax evasion for one year as set forth in our findings only as bearing on his credibility and not as evidence of fraud here. In , the Supreme Court noted that: Among the defenses often asserted is the taxpayer's claim that the net worth increase shown by the Government's statement is in reality not an increase at all because of the existence of substantial cash on hand at the starting point. This favorite defense asserts that the cache is made up of many years' savings which for various reasons were hidden and not expended until the prosecution period. We have often rejected a taxpayer's belated assertion of a secret cash hoard. (C.A. 5, 1957), certiorari denied ; (C.A. 5, 1954), certiorari denied ; ; *172 (C.A. 5, 1950), certiorari denied , all affirming Memorandum Opinions of this Court. In like manner we reject Serri's claim of a family cache and find that the asserted increases in net worth over the years came from Serri's currently taxable income derived from his medical practice in each of the years in question. We hold that the family cash hoard story was contrived and fabricated. Based on the entire record, we hold also that the respondent has proved by a preponderance of the evidence that this alleged cash hoard was not the source of petitioner's net worth increases over the years. The net worth method used by respondent in this case may place income in the year spent rather than the year earned and result in other approximations, but when the comparisons of opening and closing net worth extend over a long period of years, as here, and the beginning and ending net worth are established by clear and convincing evidence, the absence of exactitude is not serious. (C.A. 4, 1949), affirming a Memorandum Opinion of this Court. Serri's records were totally inadequate, and when a taxpayer fails to keep appropriate records as *173 required by sections 54(a) of the 1939 Code and 6001 of the 1954 Code and the regulations thereunder, the Commissioner is fully justified in making assessments based on other available evidence provided no estimate or computation is arbitrary or unreasonable. (C.A. 6, 1957), and (C.A. 4, 1950), both affirming Memorandum Opinions of this Court; . As to the years 1947 through 1956 we hold that Serri consistently omitted substantial amounts of gross income from his returns and that this omission was due to fraud with the intent to evade tax within the meaning of section 276(a) of the 1939 Code and section 6501(c) of the 1954 Code. Consequently, the assessments for 1947 through 1956 are not barred by the statute of limitations. We need not consider the 6-year statute of limitations provided in section 6501(e) of the 1954 Code. This finding of fraud also subjects Serri for the years 1947 through 1956 to the 50 percent penalty imposed by section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code. Once the statute of limitations has been opened by a finding of fraud *174 the taxpayer has the burden of proof with respect to the asserted deficiencies. . Serri offered no evidence other than the assertion of a cash hoard, and that assertion has already been rejected. The assets and liabilities, living expenses and all other items in the net worth computation were stipulated except for cash on hand, and as we have pointed out by our findings, petitioner's purchases of art objects and antiques were also stipulated with the right reserved by petitioner to submit evidence that these purchases were not made with funds from taxable income sources nor were the assets solely petitioner's. We hold that the respondent correctly determined deficiencies for each of the years 1947 through 1956 subject to the modifications found in this opinion. The Commissioner has also asserted the penalty provided in section 294(d)(2) of the 1939 Code, [2] *176 *177 for substantial underestimate of estimated tax for each of the years 1945 through 1954. We have already found that the years 1945 and 1946 are closed by the statute of limitations. Except for the year 1952, our findings of fact show that petitioner's estimated tax paid for each of the years 1947 *175 through 1954 was less than 80 percent of the tax due and was less than the amount of tax paid on his return for the preceding taxable year, respectively, and the assertion of the 294(d)(2) penalty for those years is obviously justified. Petitioner contends that the penalty is not applicable to the year 1952 since even though the estimated tax paid ($2,800) was less than 80 percent of the tax due, it nevertheless exceeded the amount of tax ($2,741.42) shown on his income tax return for the preceding year and thus comes within the exception of the second sentence of section 294(d)(2). The section in issue provides that it shall not apply to the taxable year in which the taxpayer makes a timely payment of estimated tax "in an amount at least as great as though computed * * * on the basis" of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration "but otherwise on the basis of the facts shown on his return for the preceding taxable year." It has been heretofore decided that the application of this exception rests upon a comparison of the taxpayer's declaration of estimated tax and the preceding year's tax return as filed *178 and not upon the reconstructed income and tax liability, even where it is determined that part of an asserted deficiency in tax liability for the year in question is due to fraud with intent to evade tax. (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; , affirmed in part (C.A. 6, 1959). However, it is not sufficient to merely compare the 1952 estimated tax paid ($2,800) as being in excess of the amount of income tax ($2,741.42) shown on his return for the preceding year. To come within the exception, the payment of estimated tax must at least equal the amount "computed on the basis" therein prescribed. The Revenue Act of 1951 increased the income tax rates for 1952. Therefore, under the prescribed method of computation, on the basis of the facts shown on petitioner's 1951 return, the granting of another dependency exemption, [3] and using the 1952 rates, the estimated tax would be $2,803.68, that is, greater than the amount of estimated tax actually paid in 1952. Petitioner falls outside the exception to application of the penalty. The last sentence of section 294(d)(2) *179 provides, with respect to certain taxable periods, for relief from the effects of the increase in rates, but it does not apply to the calendar year 1952. Respondent is sustained in asserting the penalty provided in section 294(d)(2) with respect to the years 1947 to 1954, inclusive. In order that the appropriate computations can be made in accordance with this opinion. Decision will be entered under Rule 50. Footnotes
1. The parties agreed that Serri bought at least $11,000 worth of antiques or art objects from Sack in 1955 and in addition a disputed highboy for $13,000 which petitioner alleges was bought by him for his assistant, Jeanette Kanady, and paid for by him with her funds to the extent of $12,100. Respondent contends that petitioner bought this antique and that his purchases from Sack in 1955 should therefore be increased from $11,000 to $23.100.
1. Petitioner's 1947 Federal income tax return also claimed Carmela as a dependent and so did his 1948 return, but in the latter return she was described as his mother. Maria Serri, petitioner's mother, was not listed as a dependent by Serri in his 1947 or 1948 returns. However, he initially told the agents that she lived with him since his father died in 1944.↩
2. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *
(d) Estimated Tax. - * * *
(2) Substantial underestimate of estimated tax. - If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66 2/3 per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year (or in the case of farmers exercising an election under section 60(a), within the last quarter) in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (or in the case of any such farmer, or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year. In the case of taxable years beginning prior to October 1, 1950, and ending after September 30, 1950, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the 80 per centum and 66 2/3 per centum requirements of this paragraph by reason of the increase in normal tax and surtax on individuals imposed by section 101 of the Revenue Act of 1950. In the case of taxable years beginning prior to November 1, 1951, and ending after October 31, 1951, the additions to tax prescribed by this subsection shall not be applicable if the taxpayer failed to meet the requirements of this paragraph by reason of the increase in rates of tax on individuals imposed by the Revenue Act of 1951.
3. Our findings of fact show that petitioner claimed Maria as a dependent mother in his tax return for 1952, but not for 1951.↩